# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Kim Arvin Johnson,                                        Civil No. 09-2162 (JNE/SRN)

      Plaintiff,

    v.                                        **REPORT AND RECOMMENDATION**

Michael J. Astrue, Commissioner
of Social Security,

      Defendant.

---

    Frank W. Levin, Frank W. Levin, PA, 331 Second Avenue South, Suite 420, Minneapolis, Minnesota 55401, on behalf of Plaintiff

    Lonnie F. Bryan, Esq., Office of the United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, on behalf of Defendant

---

SUSAN RICHARD NELSON, United States Magistrate Judge

    Pursuant to 42 U.S.C. § 405(g), Plaintiff Kim Arvin Johnson seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), who denied Plaintiff's applications for disability insurance benefits and supplemental security income (SSI). Plaintiff and the Commissioner have filed cross-motions for summary judgment, which have been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. For the reasons set forth below, this Court recommends that Plaintiff's motion be denied and the Commissioner's motion be granted.

# I.    BACKGROUND

## A.    Procedural History

Plaintiff protectively filed his applications on August 6, 2004, alleging an onset of disability date of July 5, 2002.  (Tr. at 68-73.)  The applications were denied initially (id. at 30), and on reconsideration. (Id. at 27.)   Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on February 13, 2007.  (Id.)  Plaintiff and a vocational expert ("VE") testified.  (Id.)  The ALJ issued an unfavorable decision on April 11, 2007, concluding that Plaintiff was not disabled and therefore not entitled to disability benefits.  (Id. at 26.)  Plaintiff sought review of the decision by the Appeals Council.  On June 15, 2009, the Appeals Council denied the request for review.  (Id. at 6-8.)  The ALJ's decision therefore became the final decision of the Commissioner for purposes of judicial review.  See 20 C.F.R. § 404.981.

Plaintiff filed the instant action in federal court on August 18, 2009 and filed his Motion for Summary Judgment on December 30, 2009.  Defendant filed his Motion for Summary Judgment on February 10, 2010.

## B.    Medical Evidence of Record

Plaintiff has degenerative disk disease of the lumbar spine, mental impairments, blindness in one eye and a history of chemical dependency.  (Tr. at 17-18.)  He initially experienced lumbar back pain following a 1985 motor vehicle accident and during the winter of 2003, after shoveling snow, Plaintiff reported that the back pain was exacerbated.  (Id. at 169.)  An MRI scan in March 2003 revealed a disk protrusion at L4-5 and a disk herniation at L5-S1, with impingement of the left S1 nerve root.  (Id. at 17; 233.)  A December 2005 MRI showed

extensive degenerative disk disease involving L4-5 and L5-S1, new L5-S1 disk herniation centrally, and a broadbased disk bulge at L4-5 without significant nerve root impingement.  (Id. at 453-54.)

Physical examinations from February 2003 to February 2004 revealed variable findings, with left lower extremity weakness and sensory reflex loss noted at some times, but intact strength, normal sensation and symmetrical reflexes noted on other occasions.  (Id.)  Plaintiff underwent a microdiskectomy at L5-S1 in May 2004.  (Id. at 217.)  In July 2004, Plaintiff reported no improvement in his back pain following the May surgery.  (Id. at 224-25.)  In one report from July, it is noted that Plaintiff limped, but ambulated easily (id. at 225); in another report that same month, it was noted that Plaintiff had an antalgic gait.  (Id. at 445.)  As part of a chronic pain rehabilitation consult in September 2004 at the Sister Kenny Institute, the examining physician noted that Plaintiff walked with a limp on the left, was able to stand on his toes and heels, and exhibited no gross motor or sensory deficits.  (Id. at 335.)  In October 2004, consulting physician Dr. Azam Ansari examined Mr. Johnson, noting that he was walking with the assistance of a cane, had a limp on the left and had limited lower left reflexes.  (Id. at 339-40.)  Examiner's notes from a May 2005 examination state, "He is using the cane, leaning fairly heavily on that as he is walking.  Straight leg raising is positive, and there is essentially full range of motion."  (Id. at 432.)  An examining doctor  reported in February 2006 that Plaintiff had "decreased limitation of movement of back."  (Id.. at 419.)  In March 2006, an examining doctor reported that Plaintiff was walking with the aid of a cane, exhibiting a mildly antalgic gait.  (Id. at 418.)  Several months later, in August of 2006, an examining doctor described "significant decreased range of motion with significant tenderness over the lower back.  Strength

is symmetric. Reflexes decreased but symmetric." (Id. at 489.) Examinations from September, October and November 2006 report similar findings. (Id. at 486-88.)

For pain management, Plaintiff has been prescribed OxyContin (see, e.g., id. at 191), epidural injections (id. at 173), a Fentanyl patch (see, e.g., id. at 209), Percocet (id. at 431), and over-the-counter pain medications such as ibuprofen. Throughout the medical record, doctors express concern about Plaintiff's dependence on narcotic pain medication. (See, e.g., id. at 233, 243.) For example, in March 2003, Plaintiff met with Dr. Robert Wengler, who noted that Plaintiff asked if the doctor could prescribe a stronger pain medication, because the OxyContin he was currently taking contained only 5 mg of oxycodone. (Id. at 233.) Dr. Wengler noted, "This raised some concern on my part regarding the possible familiarity that he might have with narcotics, and I suggested that the fentanyl and the oxycodone be discontinued." (Id.)

The medical record also includes various mental health diagnoses including major depressive disorder, possible schizoaffective disorder, depression – NOS ("not otherwise specified"), anxiety, a pain disorder associated with psychological features and a general medical condition, possible dependent personality disorder and polysubstance dependence. In a report dated December 6, 2004, the examining physician, Dr. Alford Karayusuf, describes some of Plaintiff's mental health concerns:

> The claimant dates the onset of his hallucinations back to 2000, stating that at night he hears the voices of police, hearing the police banging on his door, trying to arrest him. He has no idea why the police would want to arrest him or why they would be banging on his door. He also believes that he is being talked about on the bus and he hears people talking about him on the bus and that they are saying, "he's no good; he should be in jail." The claimant has never been hospitalized for psychiatric care. He started outpatient psychiatric treatment in 2000 and continues to the present time. He is now under the care of psychiatrist, Dr. Lutzwick, whom he has seen on two occasions. Dr. Lutzwick is treating the claimant with Effexor, Seroquel, and Abilify. The claimant feels these

medications do not help him. He feels depressed and has fleeting suicidal thoughts. He first had a bout of depression when he was 18 years old and was going to shoot himself, but changed his mind and didn't do it. He did not get hospitalized following that incident nor did he follow up with any kind of counseling back then. He currently sleeps poorly, waking up several times during the night. His appetite has diminished. Concentration and memory are diminished. He feels hopeless, useless and worthless. He is anxious. He worries. His thoughts are often racing. He last worked 2 ½ years ago as a janitor for a school. The job lasted two years. He quit the job because, "I was doing cocaine."

(Id. at 350.)

From the evidence in the medical record, Plaintiff first received mental health treatment in July 2003, one year following the date on which he alleges the onset of disability. (Id. at 206.) Plaintiff denies any hospitalization for psychiatric care and no records indicate such treatment. (Id. at 350.) At the July 2003 appointment, Plaintiff indicated that he began experiencing auditory hallucinations approximately three years earlier, in 2000. (Id.) Plaintiff was prescribed Seroquel and Lexapro, but continued to report hearing voices. (Id. at 18.) An examination note from August 2003, notes that depression and chronic drug psychosis had been diagnosed, and the previously-prescribed medications helped Plaintiff sleep better, although he still occasionally experienced auditory hallucinations. (Id. at 201.) Two months later, at an October 2003 examination, Plaintiff indicated that he continued to experience auditory hallucinations involving drug raids – an experience he described as "somewhat unpleasant." (Id. at 195.) Plaintiff underwent a psychological evaluation in November 2003 as part of his involvement in a chronic opioid management program. (Id. at 160-64.) The examining physician noted that Plaintiff reported auditory hallucinations which he attributed to the "dead spirits of cops," and reported having first heard the voices a few years previously, when he was selling cocaine and marijuana. (Id. at 161.) Plaintiff reported depressive symptoms and paranoia. (Id.) The examiner described

Plaintiff as "quite psychotic" and "his mental illness is not well controlled on his current psychotropic medication." (Id. at 164)  In addition, the examiner noted, "on a questionnaire, [Plaintiff] estimates that he has a sitting tolerance of 15-30 minutes, but sits in the interview without displaying pain behaviors for 60 minutes.  Such a fact would suggest that he is poor at assessing his pain, his tolerance, and his perceived abilities, or he is engaged in symptom exaggeration." (Id.)  Based on his evaluation, the examiner recommended non-opioid means of pain management, through rehabilitative and medical measures, continuation of current psychiatric care and supportive individual psychotherapy utilizing harm reduction techniques. (Id.)

During the December 2004 consultative psychiatric appointment with Dr. Karayusuf, Plaintiff reported that he was under the care of Dr. Steven Lutzwick, a psychiatrist, whom he reported having seen on two occasions. (Id. at 350.)  During the evaluation, Plaintiff reported continued auditory hallucinations, paranoia, sleep and appetite disturbance, problems with memory and concentration and feelings of hopelessness, worthlessness and fleeting suicidal ideation. (Id. at 350-51.)  At the time of the December 2004 evaluation, Plaintiff reported living at a board and care facility in Minneapolis, where he shared an apartment with a roommate. (Id. at 350.)  He indicated that he bathed daily, made his bed once a week, used public transportation or obtained rides, cleaned his apartment once a week, attended Alcoholics Anonymous ("AA") meetings once a week, watched television three hours a day and listened to music. (Id. at 350-51.)  Dr. Karayusuf noted that Plaintiff was oriented to time, place and person.  His immediate digit recall was not good – he could recall six digits forward and two digits backward.  Plaintiff could name three of the past five United States Presidents, and in the correct order, and could

perform a simple subtraction problem.  (Id.)  Dr. Karayusuf indicated that Plaintiff was polite and cooperative, displaying mild tension, good eye contact, mildly depressed mood and appropriate affect.  Diagnosing Plaintiff with cocaine and alcohol dependence in remission, cannabis abuse in remission and schizoaffective disorder, Dr. Karayusuf opined, "He is able to understand, retain and follow instructions.  He is restricted to brief superficial interactions with fellow workers, supervisors and the public.  Within these parameters he is able to maintain pace and persistence."  (Id. at 352.)

The medical record contains psychiatric treatment records from Dr. Steven Lutzwick from April to October 2005.  (Id. at 400-405.)  Dr. Lutzwick noted auditory hallucinations in April 2005, described as intermittent and non-command.  At that time, Plaintiff was noted to have no psychosis or paranoid delusions, but was experiencing mild depression.  (Id. at 404.) Dr. Lutzwick indicated that Plaintiff was well-dressed, with memory intact and full affect.  His dosage of Seroquel was increased and his prescriptions for Abilify and Effexor were continued. (Id. at 404.)  The record indicates that Plaintiff requested treatment with a therapist.  (Id. at 405.) When seen by Dr. Lutzwick again in August 2005, Plaintiff described increased depression and his Seroquel dosage was again increased, but Dr. Lutzwick also noted that Plaintiff displayed attention and concentration within normal limits.  (Id. at 402-03.)  During his last session with Dr. Lutzwick in October 2005, Plaintiff reported sadness, sleep difficulties, anxiety and the belief that others were talking about him.  (Id. at 400.)  Dr. Lutzwick noted that Plaintiff was well-groomed, with normal attention and concentration.  His Seroquel dosage was increased and Dr. Lutzwick also prescribed Ambien.  (Id. )

Plaintiff treated with Dr. Dick Sullivan for psychotherapy on four occasions from

October through December 2005.  (Id. at 395-99.)  Dr. Sullivan assessed that Plaintiff suffered

from schizoaffective disorder, depressive disorder – NOS, anxiety disorder – NOS, and ruled out

paranoid schizophrenia as a diagnosis.  (Id.)  Notes from Plaintiff's session on December 5, 2005

document that while Plaintiff continued to hear voices, they were less insistent.  (Id. at 395.)

   In March 2006, Plaintiff began treating with Dr. Roger Johnson, a psychiatrist, and

Michael Graff, a licensed social worker.  (Id. at 406-13.)  After two or three visits with Dr.

Johnson and Mr. Graff, they completed a Social Security Mental Residual Functional Capacity

("RFC") Questionnaire, in which they indicated that Plaintiff was totally disabled due to mental

impairments.  (Id.)  They opined that Plaintiff experienced marked difficulties in maintaining

social functioning and concentration, persistence or pace and exhibited four or more episodes of

decompensation of extended duration.  In addition, they opined that even a minimal increase in

mental demands or change in environment would likely cause Plaintiff to decompensate and that

he had a history of one or more years of inability to function outside a highly supportive living

arrangement and exhibited a continuing need for such an arrangement.  (Id.)  Dr. Johnson and

Mr. Graff further concluded that Plaintiff would have "poor to no ability" to engage in the

following activities:  deal with coworkers, supervisors and the public; tolerate normal

supervision; make basic decisions and exercise proper judgment in a work setting; maintain

attention and concentration for two hour segments; complete a normal work day or work week

without interruptions from psychologically based symptoms; sustain an ordinary routine without

special supervision; work with or near others without being distracted by them; perform

activities within a schedule, be punctual and adhere to basic workplace standards.  (Id. at 411-

12.)  In addition, they estimated that Plaintiff would likely be absent four or more times per

month due to psychologically based symptoms, if he were employed.  (Id. at 412.)

The record also includes notes detailing psychiatric visits with Dr. Johnson, occurring between March and July 2006.  (Id. at 461-63.)  Following an initial evaluation in March 2006, Dr. Johnson diagnosed Plaintiff with a major depressive disorder, severe, with psychotic features.  (Id. at 463.)  At the time, Plaintiff complained of some depressive symptoms and auditory hallucinations at night, while in crowds.  Dr. Johnson increased Plaintiff's dosages of Seroquel and Abilify, discontinued Effexor and started Prozac.  (Id.)  In a follow-up appointment later that month, Plaintiff reported continuing depression, but reduced auditory hallucinations and no medication side effects.  (Id. at 462.)  Dr. Johnson diagnosed major depressive disorder, recurrent, unspecified, and increased Plaintiff's Prozac dosage.  (Id.)  In May 2006, Plaintiff reported depressed mood and insomnia, with no medication side effects.  (Id.)  He was again diagnosed with major depressive disorder, recurrent, unspecified.  Dr. Johnson prescribed Remeron for sleep, although Plaintiff had not filled that prescription when he returned in June 2006.  (Id. at 461.)  In June 2006, Plaintiff was again diagnosed with major depressive disorder, recurrent, unspecified.  Also that month, Dr. Johnson completed a Request for Medical Opinion disability statement, in which he characterized Plaintiff's major depression as moderate.  (Id. at 473.)  When Dr. Johnson last saw Plaintiff in July 2006, Plaintiff reported that he was "much better."  (Id. at 461.)  He diagnosed major depressive disorder, in full remission, continued Plaintiff's medications and advised him to return as needed.  (Id.)

The medical record also includes progress notes from social worker Michael Graff for the period from March 2007 to January 2007.  Mr. Graff's notes refer to Plaintiff being arrested for aiding and abetting shoplifting in February 2006 (id. at 466), doing some painting for a friend in

July 2006 (id. at 470; 480), helping his brother look for a new vehicle in June 2006 (id. at 472), helping his brother move in May 2006 (id. at 478), cleaning his brother's apartment in June and July 2006 (id. at 471), and reading the Bible a great deal in July 2006 (id. at 469.) Plaintiff described a recurring auditory hallucination in the form of hearing a "count-down," in March and April 2006. (Id. at 481; 485.) Plaintiff also reported a lack of motivation (id. at 482), depression (id. at 480) and difficulty sleeping (id. at 477.) Mr. Graff rated Plaintiff's Global Assessment of Functioning ("GAF") at 43 to 49 (id. at 20; 467), in the "serious" range.

Plaintiff's reported use of controlled substances appears throughout the medical record. A psychotherapy note from November 2003 reports, "The patient's pain is complicated by significant psychiatric symptoms and chemical dependency. The patient has a history of alcohol dependence, cocaine dependence, a history of selling drugs, and current use of cannabis." (Id. at 158). Another evaluation, also from November 2003, notes that Plaintiff reported a history of selling cocaine and cannabis, until approximately sometime in 2002, and reported smoking marijuana on occasion. (Id. at 162.) Plaintiff indicated during a July 2003 examination that approximately three years earlier, he had been using and dealing cocaine. (Id. at 206.) A psychotherapy intake assessment performed in October 2005 describes auditory hallucinations involving a police drug raid, in which Plaintiff describes hearing the voices of police trying to break into his home, noting that "he was heavily involved in cocaine and marijuana at that time." (Id. at 398.) A physician noted in an entry from January 2004, that urine left at a previous appointment tested positive for both opiates and cannabinoids. (Id. at 179.) In a December 2004 evaluation, Plaintiff reports having used cocaine and marijuana on a nearly daily basis approximately two and half years previously. (Id. at 350.)

The record suggests that Plaintiff underwent chemical dependency treatment in the late 1970's and in 2002, but no medical records document this treatment. (<u>Id.</u> at 162.) In one record, Plaintiff acknowledged having received treatment for alcohol abuse, but denied ever receiving treatment for the use of street drugs. (<u>Id.</u> at 170.) A note in an October 2005 emergency room report indicates that Plaintiff was scheduled for inpatient detoxification, but the record contains no evidence that such treatment was pursued. (<u>Id.</u> at 424.) In a December 2004 consultative psychiatric evaluation, Dr. Karayusuf noted that Plaintiff reported having undergone chemical dependency treatment on three occasions – in 1978, 1996, and in 2001. (<u>Id.</u> at 350.)

## C. Administrative Hearing Testimony

Testifying at the administrative hearing were Plaintiff and VE Steven Bosch. Plaintiff testified that at the time of hearing, he was living with his brother. (<u>Id.</u> at 2.) Due to severe depression and the worsening condition of his back, necessitating daily pain medications, Plaintiff stated that he could no longer do the custodial work he had previously done because of the lifting and movement involved. (<u>Id.</u> at 4.) Mr. Johnson stated that he had worked as a custodian for the Hennepin County Hospital for nine years, then performed similar work for a school board for approximately two years. He resigned from both jobs, commenting, "I just wasn't pretty much interested in that kind of work pretty much anymore, but that was before my back acted up on me again." (<u>Id.</u> at 5.) Plaintiff acknowledged that he can read, but cannot write and his math skills are poor. He has not consulted with any vocational rehabilitation specialists to see if there is some type of work for which he might be suited, stating, "I don't know what my plan is." (<u>Id.</u>)

As to the treatment of his back, Plaintiff testified that to relieve the pain, he takes pain

medications, uses hot and cold packs and a transcutaneous electrical nerve stimulation ("TENS") unit, performs stretching exercises and participates in pool therapy.  (<u>Id.</u> at 6.)  He experiences constant low back pain and occasional sciatica radiating down his right leg, testifying that he can only walk for approximately 20 or 30 minutes and can sit comfortably for that length of time before he must stand.  (<u>Id.</u> at 6-7.)  In addition, Plaintiff speculated that he could lift approximately five to ten pounds on a regular basis throughout the day and could climb approximately two flights of stairs.   (<u>Id.</u> at 8.)  Mr. Johnson occasionally uses a cane, which, according to his testimony, was prescribed by a Hennepin County doctor.  (<u>Id.</u>)

In his free time, Plaintiff testified that he performs stretching exercises, watches television, washes dishes and vacuums, visits with friends every few weeks, attends church services approximately twice a month and attends AA meetings on a weekly basis. (<u>Id.</u> at 9; 11.) Mr. Johnson indicated that it takes him approximately four or five hours to complete his household chores, because he is physically unable to do everything at once.  (<u>Id.</u> at 9.)

Describing his mental health problems, Mr. Johnson testified that in the past, he had experienced auditory hallucinations which had interfered with his sleep.  (<u>Id.</u>)  However, his prescription medications had eliminated that problem "for a few weeks now," or "pretty much since I've been, see, because [Dr. Johnson] put me on Remeron for 30 milligrams after he had me on all that other stuff.  And then when he doubled the dose on that, it started fading away." (<u>Id.</u>)  Plaintiff stated that he suffers from severe depression, which has affected his sense of self-worth such that sometimes he wishes he would pass away in his sleep.  (<u>Id.</u>)

Following Plaintiff's testimony, VE Steven Bosch testified.  The ALJ posed a hypothetical question containing the limitations found in a Social Security Mental RFC

Questionnaire completed by social worker Michael Graff (<u>id.</u> at 406-13), to which Mr. Bosch responded that such a person could not perform any competitive work. (<u>Id.</u>)

The ALJ then formulated a second hypothetical question based on the RFC found in a Physical RFC Assessment completed by Drs. Alan Suddard and Mario Zarama (<u>id.</u> at 385-94), and Mr. Bosch replied that such a person would be able to perform work as a housekeeping cleaner. (<u>Id.</u> at 519.) Such jobs exist in significant numbers in the national economy, according to VE Bosch. (<u>Id.</u>)

The ALJ then considered formulating a third hypothetical question based the RFC found in a Physical RFC Assessment completed by Dr. Gregory Salmi (<u>id.</u> at 353-60), but because this physical RFC was consistent with his second hypothetical, the ALJ posed no question to Mr. Bosch based on this RFC. Finally, the ALJ formulated a final hypothetical based on the RFC found in another Physical RFC Assessment completed by Dr. Zarama (<u>id.</u> at 341-48), restricting a Plaintiff to, "medium work, with no depth perception, no professional driving, no fine detailed work, no competitive reading, avoid concentrated exposure to hazards, machinery, heights and vibration. Again, we'd be low stress, routine work, brief infrequent contact with the public, coworkers, supervisors." (<u>Id.</u> at 520.) Mr. Bosch replied that several categories of janitorial cleaner work are in the medium range and such jobs exist in significant numbers in the national economy. (<u>Id.</u>) If, however, the ALJ added to that fourth hypothetical that the same individual is isolating on a frequent basis, the VE testified that such self-isolation would have a significant impact on the individual's employability, particularly if it resulted in missing work more than twice per month, at which point competitive employment would no longer be possible. (<u>Id.</u>)

**D.     The ALJ's Decision**

The ALJ issued an unfavorable decision on April 11, 2007, concluding that Plaintiff was not disabled from July 5, 2002, the date of alleged onset of disability, to the date of the decision. (Id. at 14.)   In finding Plaintiff not disabled, the ALJ employed the required five-step sequential evaluation, considering: (1) whether Plaintiff was engaged in substantial gainful activity; (2) whether Plaintiff had a severe impairment; (3) whether Plaintiff's impairment met or equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether Plaintiff was capable of returning to past work; and (5) whether Plaintiff could do other work existing in significant numbers in the regional or national economy.  See 20 C.F.R. § 416.920(a)(4).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 5, 2002 (Id. at 16.)  The ALJ found at step two that Plaintiff's impairments, which were severe, consisted of blindness in the right eye, degenerative disk disease of the lumbar spine, status post-microdiskectomy at L5-S1 on the left, a major depressive disorder with psychotic features, a possible schizoaffective disorder, depression – NOS, anxiety – NOS, a pain disorder associated with psychological features and a general medical condition, a possible dependent personality disorder and a history of polysubstance dependence.  (Id.)  The ALJ concluded that these impairments "cause significant limitation in the claimant's ability to perform basic work activities."  (Id. )

At step three, the ALJ concluded that Plaintiff's impairments did not meet or medically equal a listed impairment.  (Id. at 16-17)  With respect to Plaintiff's physical impairments, while Plaintiff is blind in the right eye, the ALJ noted that Plaintiff's visual acuity is 20/30 in the left eye, without correction, which is inconsistent with a visual impairment of listing severity.  (Id. at

17.)

As to Plaintiff's degenerative disk disease and back impairments, the ALJ described and referenced numerous entries in the medical record documenting Plaintiff's reflexes, strength, ambulation, sensation, gait, gross motor or sensory deficits, and range of motion.  In addition, the ALJ noted that several reports indicated that Plaintiff used a cane for ambulation, but the record did not document objective medical findings consistent with a medical need for a cane. (Id.)  Moreover, the ALJ found that other reports indicated that Plaintiff was able to walk independently and Plaintiff testified that he used a cane occasionally, was able to walk 20 to 30 minutes at a time and climb two flights of stairs.  (Id.)  Notably, the ALJ found no evidence that Plaintiff had used more than one cane or a walker, and written reports indicated that Mr. Johnson was able to go out daily on an independent basis to shop, using public transportation.  The ALJ found this evidence inconsistent with a back impairment of listing level severity for any continuous twelve-month period.  (Id.)

Addressing Plaintiff's mental condition, the ALJ noted that the record contained diagnoses of several mental impairments including major depressive disorder, possible schizoaffective disorder and anxiety, among others.  (Id.)  However, the ALJ cited an entry in one record, in which Plaintiff informed a consulting psychiatrist that he quit working in July 2002 not due to mental or physical impairments, but because he was "doing cocaine" on a near daily basis.  (Id. at 17-18.)  The ALJ further noted that the medical record contains extensive evidence of narcotic-seeking behavior, as well as Plaintiff's remarks to numerous providers that he had sold and used cocaine and marijuana on a continuing basis for a period of years.  (Id.) The ALJ also found no evidence in the record of mental health treatment until July 2003 – one

year after Plaintiff's alleged onset of disability. "A review of the claimant's earnings record indicates the claimant was able to work at the substantial gainful activity level in 2001 and 2002," despite reporting auditory hallucinations. (Id.) Regarding Dr. Karayusuf's psychiatric evaluation in December 2004, the ALJ observed that while it described Plaintiff's auditory hallucinations, sleep disturbance and feelings of worthlessness, it also indicated that Plaintiff shared an apartment with a friend with whom he got along well, bathed daily, made his bed once a week, cleaned his apartment once a week, used public transportation, attended AA meetings once a week, watched television and listened to music. (Id.) The ALJ also reviewed treatment notes from Dr. Lutzwick, Dr. Johnson and social worker Michael Graff, finding that they did not document a level of severe mental impairment for any continuous twelve month period. The ALJ noted that Dr. Johnson completed a disability statement for Plaintiff in June 2006, but characterized Plaintiff's major depression as only moderate, which the ALJ found inconsistent with a complete disability. (Id. at 20.) As to Mr. Graff's GAF assessment of Plaintiff in the "serious" range, the ALJ found "this rating is inconsistent with the claimant's minimal reported symptoms, and lack of any referral for more intensive mental health treatment, such as psychiatric hospitalization, partial hospitalization, or day treatment." (Id.) Furthermore, the ALJ commented that at that time, Plaintiff was living in a board and care facility, although the record does not indicate whether the facility provided any mental health services for Plaintiff, other than dispensing psychotropic medications. (Id.)

> In this regard, the undersigned notes that in October 2003, the claimant requested that his psychotropic medications be prescribed on an as-needed basis, because he was returning to the board and care facility after 10:30 p.m., and missing his bedtime medications. This evidence suggests that the claimant was able to come and go from the facility as he chose, and was active outside the facility.

(Id.)   The ALJ also relied on evidence in the medical record, and Plaintiff's testimony, in which he described his daily activities, grooming, and socializing.  The ALJ therefore found that Plaintiff's mental impairments resulted in only mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration. (Id. at 21.)  The ALJ thus concluded that Plaintiff's mental impairments, while severe, were not of sufficient severity to meet or equal a listed impairment.  (Id.)

The ALJ then proceeded to step four where he determined that Plaintiff had the RFC

to perform work requiring lifting 20 pounds occasionally and 10 pounds frequently, with standing/walking six hours in an eight hour work day, and sitting six hours in an eight hour work day, no climbing of ladders, ropes, or scaffolds, only occasional climbing of ramps or stairs, only occasional balancing, stooping, kneeling, crouching, or crawling, no tasks requiring good depth perception or full lateral field of vision, no work around hazards, and routine, repetitive, low stress work tasks, with brief, superficial, infrequent contact with supervisors, coworkers, and the public.

(Id.)

In assessing Plaintiff's RFC, the ALJ found that Plaintiff's claimed medical impairments could reasonably be expected to produce the alleged symptoms, but that Plaintiff's statements about the intensity, persistence and limiting effects of these symptoms were not entirely credible. (Id. at 22.)  In assessing Plaintiff's physical condition, the ALJ gave weight to the fact that Plaintiff had worked in substantial gainful employment despite the blindness in his right eye, and that his uncorrected vision in his left eye was excellent.  With respect to Plaintiff's back impairment, the ALJ noted evidence of narcotic-seeking behavior in the record, as well as records which both documented Plaintiff's injuries, but also revealed moderate levels of physical activity, e.g., reports that Plaintiff experienced disabling back pain after shoveling snow in 2003,

back pain after falling off his bike in September 2002, back pain following pool therapy in October 2002, and back pain after falling in December 2002.  (Id. at 23.)  In December 2002, entries in the record indicated that Plaintiff presented with a cane, yet was able to move about independently without difficulty.  (Id.)  The ALJ also gave considerable weight to medical records further describing narcotic prescriptions and Plaintiff's narcotic-seeking behavior, with limited records documenting physical therapy.  Notably, the ALJ found that many records documented that Plaintiff did not appear to be in any significant distress.  Overall, the ALJ found the evidence, as whole, inconsistent with disabling pain, but consistent with narcotic-seeking behavior.  (Id. at 24.)

In assessing Plaintiff's mental condition, the ALJ gave weight to the fact that the medical record contained evidence of only sporadic mental health treatment since July 2003.  (Id.)  The ALJ emphasized that when Plaintiff received more regular treatment from March 2006 onward, his treating psychiatrist concluded that Plaintiff's major depression was in remission by July 2006, and subsequent progress reports from Plaintiff's therapist documented few mental impairments, and involvement in a wide variety of activities.  The ALJ found this evidence inconsistent with disabling symptoms. (Id. )

The ALJ also placed weight upon evidence in the record that Plaintiff stopped working due to the use of cocaine rather than due to physical or mental impairments and had not attempted any work since July 2002, nor sought any vocational rehabilitation services.  (Id.)  As for the opinion evidence presented about Plaintiff's alleged disability, the ALJ found the opinions inconsistent with contemporaneous treatment records documenting major depression in remission and no recommendation or need for more intensive treatment.  (Id.)  The ALJ found

18

that other opinion evidence from consulting medical sources, including an examining

psychiatrist, was consistent with the RFC for modified light level work, with routine, repetitive

work tasks and no more than brief, infrequent superficial contact with others.  (Id.)   The ALJ

thus determined at step four that Plaintiff was unable to perform his past relevant work as a

janitor, performed at the medium, unskilled level, and as a salesperson, performed at the light,

semiskilled level because they required "exertional and nonexertional demands in excess of the

claimant's residual functional capacity."  (Id. at 25.)

The ALJ then proceeded to step five to determine whether Plaintiff could perform jobs in

the national economy.  (Id. at 35.)  Mr. Bosch indicated in a "Vocational Analysis" form

completed in connection with his testimony, that Plaintiff's past relevant work as a janitor, DOT

code 381.687.018, had been unskilled and of medium exertion.  (Id.  at 323.)  Based on the

testimony of the VE in response to the second hypothetical question, which, in relevant part,

limited Plaintiff to light work, the ALJ determined that Plaintiff could work as a housekeeping

cleaner.   Based on the testimony of VE Bosch in response to the second hypothetical question,

the ALJ determined that Plaintiff could perform light work and " would be able to perform the

requirements of representative occupations such as housekeeping cleaner (10,000 jobs)."  (Id. at

26.)

## II.      STANDARD OF REVIEW

Congress has prescribed the standards by which Social Security disability benefits may

be awarded.  "The Social Security program provides benefits to people who are aged, blind, or

who suffer from a physical or mental disability."  Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir.

1992).  A person is disabled "if he is unable to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." Id. § 1382c(a)(3)(B).

### A.    Administrative Review

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision. 20 C.F.R. § 416.1409(a). A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ. Id. § 416.1429. If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, although review is not automatic. Id. § 416.1467. The decision of the Appeals Council, or of the ALJ if the request for review is denied, is final and binding upon the claimant unless the matter is appealed to a federal district court within sixty days after notice of the Appeals Council's action. 42 U.S.C. §§ 405(g); 20 C.F.R. § 416.1481.

### B.    Judicial Review

Judicial review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence in the record as a whole. Hutsell v. Sullivan, 892 F.2d 747, 748-49 (8th Cir. 1989). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402

U.S. 389, 401 (1971).  The review is "more than a mere search of the record for evidence supporting the [Commissioner's] finding."  Brand v. Sec'y of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).  Rather, "'the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'"  Id. (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).

The reviewing court must review the record and consider:

1.  The credibility findings made by the ALJ.
2.  The plaintiff's vocational factors.
3.  The medical evidence from treating and consulting physicians.
4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.
5.  Any corroboration by third parties of the plaintiff's impairments.
6.  The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairments.

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989) (citing Brand, 623 F.2d at 527).  A court may not reverse the Commissioner's decision simply because substantial evidence would support an opposite conclusion, Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984), and in reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact, Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  Instead, the court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).  If it is possible to reach two inconsistent positions from the evidence, and one of those positions represents the Commissioner's decision, the court must affirm that decision.  Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).

## III.    DISCUSSION

Plaintiff presents a narrow issue in his Motion for Summary Judgment, arguing that the ALJ's reliance on vocational expert testimony was improper in that the ALJ failed to resolve an alleged conflict between the VE's testimony and the Dictionary of Occupational Titles ("DOT") and failed to explain how he resolved the conflict.  (Pl.'s Mem. Supp. Summ. J. at 1.)  Plaintiff does not challenge the ALJ's findings with respect to Plaintiff's RFC, credibility determinations or his consideration of the medical record.

The ALJ concluded that Plaintiff possessed the RFC to perform light work, with certain limitations, and, deferring to the VE's expertise, the ALJ concluded that Plaintiff could perform the work of housekeeping cleaner, of which 10,000 jobs exist in Minnesota, meeting the limitations of the RFC.   (Tr. at 25-26.)  The ALJ's conclusion was based, in part, on the VE's response to the second hypothetical question posed by the ALJ.   Plaintiff's only issue on appeal of the ALJ's decision is that the VE's testimony in response to this particular hypothetical question was improper, and, assuming that it was improper, the ALJ did not properly resolve a conflict between the VE's testimony and the DOT classification system.

Specifically, the ALJ asked whether there were jobs at the light exertional level, with additional limitations including the following: no tasks requiring good depth perception, avoidance of concentrated exposure to hazardous machinery and heights, psychological limitations, low stress and brief infrequent, superficial contact with the public, coworkers and supervisors.   (Id. at 519.)  The ALJ responded, "Well, this individual did work as a housekeeping cleaner, reflected in my exhibit.  And I think your second hypothetical would allow for that type of work."  (Id.)  The VE did not identify "housekeeping cleaner" with a

specific DOT number. The VE then opined that 10,000 housekeeping cleaner jobs matching that RFC exist in Minnesota. The ALJ then asked a final hypothetical calling for work at a medium exertional level. (Id. at 519-20.) The VE responded that several categories of janitor cleaner work fall within the medium range, including DOT code 381.687.018, which is the code applicable to Plaintiff's past work and is the code reflected on the VE's Vocational Analysis exhibit describing Plaintiff's past work. The VE opined that 20,000 such janitor cleaner jobs exist at the medium level in Minnesota. (Id. at 520.)

The vocational expert is considered a specialist in employment and vocational factors which influence employment and an ALJ may justifiably rely on a vocational expert's testimony in determining whether a claimant is disabled. See Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Circ. 1991). Although VE Bosch's statement that Plaintiff performed past work "as a housekeeping cleaner, reflected in my exhibit," was incorrect – Plaintiff's past work as reflected in the exhibit was as a "janitor" – the VE's substantive testimony that the housekeeping cleaner position fulfilled the requirements of the ALJ's second hypothetical was correct, in that the DOT classifies "Cleaner, Housekeeping" (DOT code 323.687-014) as being unskilled and of light exertion.

Reading the VE's testimony in its full context demonstrates that the VE did not consider the housekeeping cleaner position synonymous with the janitor position listed on the Vocational Analysis form. In his final hypothetical question to the VE, the ALJ changed the RFC and asked if there were medium-skilled jobs meeting the hypothetical criteria. In response, the VE specifically identified janitor as a medium-skilled job, citing the specific DOT code 381.687.018 – the job and DOT number listed on the Vocational Analysis exhibit – and identified 20,000

such jobs in Minnesota.

In response to the second hypothetical, the VE had identified 10,000 housekeeping cleaner jobs of the light exertional level, and, in response to the final hypothetical, the VE identified 20,000 janitor jobs of the medium exertional level. This difference demonstrates that the VE made the correct distinction between light and medium exertion. While the VE may have misspoke when he stated that housekeeping cleaner was reflected on his Vocational Analysis exhibit, his substantive testimony was accurate that housekeeping cleaner is a light exertional job meeting the RFC set forth in the ALJ's second hypothetical. The ALJ reasonably accepted the testimony of the VE that Plaintiff's RFC would not preclude him from performing the requirements of the job of housekeeping cleaner, which he described as being of light exertion and unskilled. (Id. at 519, see also id. at 25-26.) Accordingly, there is no discrepancy between the "Cleaner, Housekeeping" description in the DOT and the characterization of the job as described by the VE.

Because substantial evidence supports the ALJ's finding that Plaintiff was not disabled, the Court recommends that Plaintiff's Motion for Summary Judgment be denied and Defendant's Motion for Summary Judgment be granted.

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff's Motion for Summary Judgment (Doc. No. 9) be **DENIED**; and

2.      Defendant's Motion for Summary Judgment (Doc. No. 13) be **GRANTED**.


Dated: June 28, 2010

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States Magistrate Judge



Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **July 13, 2010**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.